**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Richard H. PRESCOTT, Jr., Jesse E. Threlkeld, Acy L. Long, Harold D. Sheffield & William F. Mann, Defendants-Appellants.**

No. 80–7736.

United States Court of Appeals, Eleventh Circuit.

April 8, 1982.

Rehearing Denied May 13, 1982.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Richard H. Prescott, Jr., Acy L. Long, Harold D. Sheffield, Jesse E. Threlkeld and William F. Mann, all former officials of the City of Saraland, Alabama, were convicted by a jury of conspiring to use their offices to extract payoffs and kickbacks in violation of the Hobbs Act, 18 U.S.C. § 1951 (1976).[1] In addition, each was convicted of committing from one to ten substantive violations of the Hobbs Act by extracting payoffs and kickbacks from real estate developers, contractors and others who dealt with the City. In this appeal they ask us to direct the entry of judgments of acquittal on the conspiracy charge because the government's proof at trial varied materially from the allegations of the indictment. The proof, they contend, established not one conspiracy, as alleged in the indictment, but ten separate and unrelated conspiracies. They also seek acquittals or new trials on the substantive counts because of various trial errors.

We find that the evidence fully supports the indictment's charge of a single conspiracy and therefore affirm the convictions on that charge. As for the substantive counts, the claims of trial error are so devoid of merit that they warrant no discussion. We therefore affirm the convictions on those charges as well.

Charles N. McKnight, Mobile, Ala., for R. Prescott.

Barry Hess, Virginia A. Johnston, Mobile, Ala., for Threlkeld.

Edward B. McDermott, Mobile, Ala., for Long and Sheffield.

John M. Tyson, John M. Tyson, Jr., Mobile, Ala., for Mann.

W. A. Kimbrough, Jr., U. S. Atty., William R. Fayre, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

## I.

The evidence, properly viewed in the light most favorable to the government, tells the following story. The City of Saraland is a small town located in southwest Alabama, near Mobile. In 1975, the City was experiencing rapid growth, and substantial demands were being made on its government, principally the city council, to provide more services. The city council consisted of five

---

1. Whoever in any way or degree obstructs, delays, or affects commerce ... by robbery or extortion or attempts or conspires so to do ... shall be fined ... or imprisoned....
     \*    \*    \*    \*    \*    \*

The term "extortion" means the obtaining of property from another, with his consent, induced ... under color of official right....
18 U.S.C. § 1951(a) and (b)(2).

elected members and the mayor. Each elected councilman had one vote, and the mayor had two—a regular vote and a tie breaker when the council was equally divided.

In May 1975, three members of the city council, Marshall "Hap" Havard and appellants Long and Sheffield, concocted a kickback scheme whereby those who wished to do business with the City would pay them for the privilege of doing so.[2] These councilmen immediately included appellant Mann in their scheme. Mann was the city building inspector. His role in the scheme was to contact builders who needed to connect their construction projects to the City's sewerage system. The system's treatment plant was near capacity at the time, and the city council had considerable room for discretion in granting and denying builders' applications for sewerage connections. Mann was to tell the builders that they would have to pay under the table to have their applications approved by the council.

Poly-Engineering, a private firm that served as the city engineer, became the first kickback victim. Havard called on Arnold Parsons, Poly-Engineering's president, and told him the city council would continue to employ his firm in return for 5% of all fees paid to the firm by the City. Poly-Engineering was dependent on the City's business, so Parsons agreed to the demand. Beginning in August 1975, Havard met Parsons every two or three months at the offices of Poly-Engineering and was paid in cash. He split each payment with Long and Sheffield. By December 1978, Havard had collected over $9,300.

Mann arranged the second kickback, also in August 1975. Saraland was in need of a dragline. While searching for a suitable dragline, Mann discovered that Gulf Atlantic Equipment Co. was in desperate need of cash. Mann approached Gulf Atlantic and said the City would buy one of its used draglines if the company would take care of the city council. Gulf Atlantic indicated a willingness to do business on those terms, and Mann quickly lined up the necessary

votes, Sheffield, Havard and the mayor, appellant Prescott. The council approved the dragline purchase, and Gulf Atlantic gave Mann $8,500. Mann received the kickback in his office at City Hall and then met with Havard, Prescott and Sheffield to divide the proceeds.

The next extortion victim was Houston Roberts. The city council had decided to build some tennis courts, and Roberts wanted the contract. He approached Mayor Prescott in an attempt to get council support. Prescott told him that his personal intervention in Roberts' behalf would cost $6,000. Prescott instructed Roberts to figure the payment into the contract price and to get two other contractors to submit higher bids so he would be sure to get the job. Roberts next sought Havard's support. He told Havard that Prescott had been taken care of, and asked what it would take to deliver a majority of the council. Havard said three more council votes would cost another $6,000. Roberts included all of the kickback payments in his bid price of $99,000, got two "competitive" bids in excess of $100,000 and received the contract. Roberts then paid Prescott and Havard in cash as promised; Havard, in turn, gave Long and Sheffield $1,000 each for their votes.

In February 1977, while the tennis courts were under construction, Prescott and Havard asked Roberts if he would do some street paving for the City. They said he could have the job for $6,000, $2,000 for Prescott and $4,000 for Havard, Sheffield and Long. Before bids for the contract were solicited, Mann, who would prepare the plans and specifications for the contract and supervise the work, told Roberts he would have to have $1,000.

This time Roberts did not include the kickbacks in his bid for the job. When his bid was accepted, Roberts told Prescott and Havard that there was not any money in the contract for them. When the work began, Prescott and Havard dispatched Mann to the job site to tell Roberts to cut the "prime" (a liquid bituminous asphalt)

2. The city council approved all contracts entered into by the City.

and the thickness of the pavement to make room for the kickbacks. Roberts complied and paid Prescott and Havard $6,000. Of that, Long and Sheffield received $1,000 apiece. Roberts eventually suffered a loss on the job, so he went to Prescott for help. Prescott's only suggestion was not to pay off Mann. When Roberts told Mann there was nothing left for him, Mann said he would "blow the whole thing wide open." The threat produced $800.

Soon after he completed his supervision of Roberts' paving contract, Mann began selling permits to tie into the City's aging sewage treatment plant. Because the capacity of that plant was limited, the city council did not issue permits to connect onto the sewerage system as a matter of course. B. O. Richardson, a local real estate developer who sought a permit for twenty-four townhouse apartments, had been turned down by the council. Richardson took his problem to Mann. Mann said he could have the permit for $500 in cash, $125 for Mann and $375, split among Long, Sheffield and Havard. Richardson renewed his application for the permit, the council granted it and the councilmen received their money.

By October 1977 the payoff scheme was widespread. Appellant Threlkeld, a newly elected councilman, told Tommy Robinson, who had sought his support for a sewerage hookup for 100 apartments, "No one in this town gets anything unless they are willing to pay for certain items like sewerage and all." Threlkeld quoted Robinson $5,000 as the price of council approval of his permit application. Robinson agreed to pay it, Threlkeld lined up Havard, Long and Sheffield and the deal went through.

The sale of sewer permits continued unabated. In January 1978, Mayer Perloff, a lawyer retained by Saraland to act as the city attorney, paid Havard, Long and Sheffield $2,700 in cash for sewer connections for a housing development being constructed by his cousin, Mayer Mitchell. In February, B. O. Richardson needed another permit for twenty-four apartments, and paid Mann $1,000 for the council's approval. As he had done before, Mann lined up the votes of Havard, Sheffield and Long and paid each of them a one-fourth share, $250, keeping one-fourth for himself.

The next kickback disclosed by the evidence was arranged by Mayor Prescott. In February 1978, the City purchased a golf course from Albert Meaher, Sr. Meaher paid Prescott $30,000 to obtain council approval of the transaction on terms favorable to Meaher. The council voted to pay $120,000 for the land, an amount sufficient to cover the kickback and to net Meaher his $90,000 asking price. Of the $30,000 received from Meaher, Prescott kept $22,500 and gave Havard, Sheffield and Long $2,500 each.

The last kickback in this case occurred in the early months of 1979. City Attorney Perloff had done some condemnation work and had submitted his statement for services to the council for approval. He asked for $22,500. Long, Sheffield and Havard told Perloff that the fee would not be approved unless he paid them $7,500. Perloff agreed and the council approved his fee. Perloff was paid on March 13. On March 22, he gave Havard and Sheffield $7,500; they, in turn, gave Long $2,500.

Havard was subsequently indicted under the Hobbs Act for extorting money for sewerage hookups. He was tried and convicted and sentenced to prison for twenty years. After he was sentenced, Havard decided to cooperate with the government. He disclosed the payoffs involved in this case, was granted immunity and testified against appellants. Havard calculated the kickbacks they received as follows: Sheffield $14,500, Long $12,375, Threlkeld $2,000, Prescott $32,625 and Mann $3,300. The total, including Havard's share, exceeded $82,000.

## II.

The only claim in this appeal that merits discussion is the contention of Threlkeld, Prescott and Mann that the evidence failed to establish the single conspiracy alleged in the indictment. They contend it established several independent conspiracies. The legal question they raise is whether

886

there was a material variance in the proof and, if so, whether such variance permeated the entire trial and had a substantial and injurious effect or influence on the jury's verdicts. *See United States v. Perez*, 489 F.2d 51, 57 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); [3] *United States v. Morado*, 454 F.2d 167, 170 (5th Cir.), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). *See also Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Appellants concede that the evidence disclosed a kickback scheme that began in 1975 and continued until Councilman Havard was indicted. Appellants also concede that they shared in the proceeds of some of the payoffs generated by the scheme. Despite these concessions, they say that the government failed to prove a single conspiracy because it failed to show "that the alleged conspirators: knew or should have known of the scope of the conspiracy; shared a common single goal; benefitted from each other's activities or participation; or, that the activities constituted a single unified scheme." *United States v. Leach*, 613 F.2d 1295, 1299 (5th Cir. 1980). *Cf. Blumenthal v. United States*, 332 U.S. 539, 557–60, 68 S.Ct. 248, 257–58, 92 L.Ed. 154 (1947) (evidence that defendants knew of the scope of the conspiracy and accepted the scheme's common goal was sufficient to permit inference that they were engaged in a single conspiracy).

■■■ Threlkeld, Prescott and Mann insist that Havard, Sheffield and Long, in order to increase their take, kept them in the dark about much of the kickback scheme, so that they did not participate in many of the transactions disclosed by the evidence. Because they had no knowledge of the transactions in which they did not

participate, the argument goes, they did not know and could not have known of the scope of the conspiracy alleged in the indictment.[4] The evidence plainly refutes these arguments. The jury could properly infer that Threlkeld, Prescott and Mann were part of a single conspiracy, the goal of which was to sell the support of the Saraland city council to those willing to pay.

Unquestionably, Havard, Sheffield and Long were the central figures of that scheme; they devised the plan and their block vote controlled the council. However, the overwhelming evidence adduced at trial made it equally clear that Threlkeld, Prescott and Mann knew the scope of this scheme and joined in its goal, not as central figures, but as brokers agreeing tacitly with Havard, Sheffield and Long that they would share in the proceeds of a payoff whenever they found a victim and arranged the price of the council's support. It was in Mann's home that the conspirators' first victim, Poly-Engineering, was selected. That Mann did not share in the Poly-Engineering payoff is unimportant, because he was a willing participant in the many shakedowns that followed over the next three years. Prescott acquired full knowledge of the scheme when Mann introduced him to the Gulf Atlantic dragline deal in August 1975; he learned that three councilmen were selling their votes and that Mann was generating much of the business. Prescott then joined them and even arranged the Roberts and Meaher payoffs. Threlkeld understood the scope of the conspiracy from his first day on the council: "nobody gets anything around [Saraland] without paying for certain items like sewerage and all." He put together the Tommy Robinson deal.

Each of the appellants in this case was a full blown member of the single conspiracy

---

**3.** We are bound by decisions rendered by the Court of Appeals for the Fifth Circuit before the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

**4.** Threlkeld also insists that merely because he was not on the council when the conspiracy began in 1975, he cannot be part of that

scheme. This assertion is without merit. *See United States v. Jones*, 480 F.2d 954, 958 (5th Cir.), *cert. denied*, 414 U.S. 1071, 94 S.Ct. 582, 38 L.Ed.2d 476 (1973) (late joiners in ongoing drug smuggling scheme were properly convicted under indictment charging single conspiracy from the date the scheme was concocted). *See also Leach*, 613 F.2d at 1299.

alleged in the indictment. Their convictions are AFFIRMED.