720 F.2d 1527
 14 Fed. R. Evid. Serv. 1267
 UNITED STATES of America, Plaintiff-Appellee,
v.
Willard Eugene WALKER, James Joseph Gustin, Jr., Thomas
Gerald Durden, Jerry Lee Lowe, Kenneth
Lightbourne, John D. Dukes, and James L.
Boyington, Defendants-Appellants.
 No. 82-7277.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 12, 1983.
 
 M.A. Marsal, George L. Simons, Mobile, Ala., for Walker.
 John D. Whetstone, court-appointed, Gulf Shores, Ala., for Gustin.
 Al Pennington, court-appointed, Mobile, Ala., for Lowe.
 Tom Taul, III, court-appointed, Mobile, Ala., for Durden.
 John R. Weed, court-appointed, Perry, Fla., for Dukes, Lightbourne, and Boyington.
 William R. Favre, Jr., Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellee.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before VANCE and CLARK, Circuit Judges, and SWYGERT*, Senior Circuit Judge.
 VANCE, Circuit Judge:
 
 
 1
 Appellants, Willard Walker, James Gustin, Jr., Thomas Durden, Kenneth Lightbourne, Jerry Lowe, James Lemar Boyington, and David Dukes, Jr., were convicted in the United States District Court for the Southern District of Alabama on charges of distributing and possessing marijuana with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1) and conspiracy to distribute marijuana in violation of 21 U.S.C. Sec. 846. The individual appellants challenge their convictions on a number of grounds, but we find no merit to any of their contentions and therefore affirm.
 
 I. FACTUAL BACKGROUND[1]
 
 2
 In early November 1981 the sheriff's department in Baldwin County, Alabama hired John Carlisle, a Pensacola restaurant owner and a long-time paid informant for various law enforcement agencies, as an undercover operative to investigate illegal drug traffic in Baldwin County. Using the alias of Vito Lombardio, Carlisle contacted Michael Miceli, a restaurant owner in Gulf Shores, Alabama, representing that he was interested in purchasing some local businesses on behalf of a group of out-of-town businessmen. Carlisle and Miceli had a meeting at the Convention Center in Gulf Shores to discuss the possible sale of Miceli's restaurant, and Carlisle asked Miceli if he knew of any other local businessmen who might be in financial difficulty and interested in selling out to his backers. Miceli suggested that Carlisle contact James Gustin, who owned the Blue Jay Restaurant and Lounge in Gulf Shores and another restaurant in Pensacola. Carlisle subsequently asked Miceli to arrange a meeting with Gustin, and the three men met at the Bear Point Marina on December 4, 1981. This preliminary meeting was followed by another the next afternoon at Gustin's restaurant, where Gustin and Carlisle continued their discussion about the possibility of a sale. The two men also talked about gambling, police corruption, and drug sales in the area, and Carlisle testified that Gustin complained of his inability to find an Alabama buyer for seven thousand pounds of marijuana a few months earlier. Carlisle informed Gustin that he had contacts up north that had the capability to move large amounts of marijuana and then promised to get back in touch with Gustin to discuss price and quantity. Carlisle stated that Gustin used a number of code words common in the drug trade during their conversation, such as "lettuce" (a synonym for marijuana), "acreage" (indicating a pound of marijuana), and "swamp land" (referring to low-grade marijuana).
 
 
 3
 At the end of the meeting Carlisle told Gustin that he needed to talk things over with his backers, but the two men exchanged phone numbers and remained in close contact over the next several days. On December 11, Carlisle and Gustin met again at the Flying K Truck Stop in Baldwin County. Carlisle was accompanied by Robert Lasseter, a special agent with the Drug Enforcement Administration who was posing as one of the "money men" behind Carlisle. Agent Lasseter testified that the conversation dealt with a proposed sale of approximately two thousand pounds of marijuana for a price of between $250 and $325 a pound. Lasseter also stated that he and Carlisle rejected Gustin's demand for an advance of fifty thousand dollars. Although no deal was concluded on this occasion, Carlisle and Gustin had frequent conversations over the next several days. Gustin had by this time enlisted the assistance of two friends, Willard Walker and Jerry Lowe, and the three men met with Carlisle to discuss the transaction at the Cutty Sark Liquor Store in Florida a few days after the first meeting at the Blue Jay. They had further meetings on December 15 at the Rodeway Inn outside of Pensacola and again on at least one other occasion at the Flying K.
 
 
 4
 By December 28 the deal was ready to be closed. Gustin and Lowe informed Carlisle that they wanted to see the money before setting the transaction in motion, so Carlisle arranged to meet them in the parking lot of the International Trade Center Building in Mobile at 3:30 that afternoon. Carlisle was joined there by FBI special agent Thomas Kirspel, who was introduced to Lowe and Gustin as one of the drivers who would take the marijuana back north after the transfer was made. Lowe and Kirspel went over to the American National Bank, where Kirspel showed him a safety deposit box containing $275,000 in cash. They rejoined the other two men and made some final arrangements. Lowe told Carlisle that he and Kirspel should obtain a rental truck and bring it to him in Gulf Shores. Lowe would then arrange to have the truck pick up the marijuana and bring it to a rendezvous point where it would be transferred to Kirspel. When the transfer was complete and Kirspel had examined the marijuana to his satisfaction, he would place a phone call to Carlisle at another location, instructing him to turn over the money to Gustin and Walker. It was also agreed that Walker and Lowe would receive five dollars for every pound of marijuana delivered, with the remainder of the money apparently going to Gustin and the suppliers in Florida.
 
 
 5
 This plan was set into motion on December 29. Carlisle and Kirspel delivered a rental truck to Lowe in Gulf Shores that afternoon, and Lowe then drove it down to Pensacola, accompanied by Walker. At some point Lowe had made contact with Lemar Boyington, who agreed to supply him with three or four hundred pounds of marijuana. Lowe and Boyington met each other in Pensacola, where Lowe gave him the keys to the truck before returning to Gulf Shores. In a series of tape-recorded conversations over the course of the evening, Lowe and Gustin reported to Carlisle that they had encountered various problems with their Florida suppliers and therefore would be able to deliver substantially less marijuana than they had originally anticipated.
 
 
 6
 At 11:00 that night, Lowe, Gustin, and Walker met Carlisle, Kirspel, and Lasseter at a Shell service station in Spanish Fort, Alabama. Lowe and Kirspel drove off together to rendezvous with the rental truck and a car that was bringing the marijuana from Pensacola, while the other three settled down to wait at a local shopping center for the telephone call that would confirm that the marijuana had been delivered. Lowe and Kirspel met the rental truck and car along Interstate 10 near Malbis and pulled off the highway in a secluded area, where the defendants Lemar Boyington, Lightbourne, Durden, and Dukes began transferring bales of marijuana from the car to the rental truck. Agent Kirspel examined the bales and then alerted law enforcement officials who were waiting in the area to arrest Lowe and the other four men. Walker, Gustin, and Earl Boyington were taken into custody at the shopping center where they were waiting with Carlisle and Lasseter.
 
 
 7
 The defendants all pleaded not guilty and were tried before a jury beginning on March 29, 1982. The trial court declared a mistrial after the jury announced that it was unable to reach a verdict, and a second trial was commenced on June 16. The jury found all of the defendants guilty on both counts except for Earl Boyington, who was acquitted. We turn now to a consideration of the alleged errors raised by the defendants on appeal.
 
 II. DISCUSSION OF ISSUES
 A. Severance
 
 8
 James Gustin and the four Florida defendants--Lemar Boyington, Kenneth Lightbourne, Thomas Durden, and David Dukes--all contend that the trial judge erred by refusing to grant their requests for a severance. The four Florida defendants assert that the sheer volume of the government's evidence against Gustin, Lowe, and Walker, as well as the entrapment defenses offered by these three defendants and the evidence of predisposition submitted by the government in rebuttal, served to confuse the jury and prejudice their cases through evidentiary overspill. Gustin argues that his case should have been tried separately from those of Lowe and Walker because, although all three men presented an entrapment defense, his desperate financial circumstances made his claim significantly more plausible than that of his codefendants. As a result of the joint trial, Gustin contends, this distinction was lost on the jury and they failed to give the facts of his case independent consideration. Gustin also asserts that the rebuttal evidence on the issue of predisposition that the government presented against Walker further prejudiced his defense.
 
 
 9
 A motion requesting severance of either offenses or parties under F.R.Crim.P. 14 is a matter for the sound discretion of the trial judge. United States v. Berkowitz, 662 F.2d 1127, 1132 (5th Cir. Unit B 1981). The general rule is that defendants who are jointly indicted should be tried together, and this rule applies with particular force to conspiracy cases. United States v. Howell, 664 F.2d 101, 106 (5th Cir. Unit B 1981), cert. denied, 455 U.S. 1005, 102 S.Ct. 1641, 71 L.Ed.2d 873 (1982). When assessing the merits of a severance motion, the trial court must balance the possibility of prejudice to the defendant against the public interest in judicial efficiency and economy,[2] United States v. Phillips, 664 F.2d 971, 1016 (5th Cir. Unit B 1981), cert. denied sub nom. Meinster v. United States, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), and severance will be granted only if a defendant can demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense. United States v. Marszalkowski, 669 F.2d 655, 660 (11th Cir.), cert. denied sub nom. Brock v. United States, --- U.S. ----, 103 S.Ct. 208-09, 74 L.Ed.2d 167 (1982); Howell, 664 F.2d at 106. It is not enough for the defendant to show that acquittal would have been more likely had the defendant been tried separately, Tillman v. United States, 406 F.2d 930, 935 (5th Cir.), vacated in part on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969), since some degree of bias is inherent in a joint trial. Marszalkowski, 669 F.2d at 660.
 
 
 10
 A defendant does not suffer compelling prejudice simply because much of the evidence presented at trial is applicable only to his codefendants, Berkowitz, 662 F.2d at 1135 n. 8, or because the prosecution introduces damaging evidence concerning a codefendant's reputation or criminal record. United States v. Lippner, 676 F.2d 456, 465 (11th Cir.1982); Howell, 664 F.2d at 106. To the extent that Gustin and the Florida defendants complain of the impact of the rebuttal evidence or that the bulk of the evidence presented was directed against other defendants, therefore, their claims must be rejected.
 
 
 11
 Severance may be required, however, when codefendants present defenses that are not merely facially inconsistent, but mutually exclusive and irreconcilable, Berkowitz, 662 F.2d at 1133, or when under all the circumstances of the case and as a practical matter the jury cannot keep separate the evidence relevant to each defendant and render a fair and impartial verdict as to each. See Tillman, 406 F.2d at 935.
 
 
 12
 This circuit has long since established that entrapment defenses and simple not guilty pleas are not mutually exclusive or irreconcilable per se. United States v. Lentz, 624 F.2d 1280, 1290 (5th Cir.1980), cert. denied, 450 U.S. 995, 101 S.Ct. 1696, 68 L.Ed.2d 194 (1981); United States v. Morrow, 537 F.2d 120, 138 (5th Cir.1976); United States v. Eastwood, 489 F.2d 818, 822 (5th Cir.1973). Turning to the facts in this case, we find no basis for holding that the differing defenses were irreconcilable in this instance. The Florida defendants apparently sought to argue that the men in the delivery group did not necessarily know what they were transporting into Alabama because the contraband was securely wrapped in opaque plastic bags. Since the Florida defendants therefore sought to present themselves at trial as unknowing dupes of the Gulf Shores defendants, the jury's conclusions about the motivations of the Gulf Shores defendants in agreeing to Carlisle's blandishments were hardly critical to the success or failure of their defense. The only Florida defendant who presents a somewhat closer case in this regard is Lemar Boyington, since testimony given by Jerry Lowe in an attempt to bolster his entrapment defense implicated Boyington in the larger conspiracy. Lowe's testimony would clearly have been admissible against Boyington on the conspiracy count even if the trials had been severed, however, and the evidence against Boyington on the possession and distribution count was so overwhelming that it is impossible to conclude that he was convicted as a result of an unfair trial. See Berkowitz, 662 F.2d at 1135-36.
 
 
 13
 Having concluded that the defenses presented by the two groups of defendants were not mutually exclusive and irreconcilable, we now turn to consider whether the inconsistencies between their defenses must have confused or misled the jury to such an extent that prejudice resulted against Gustin and the men in the delivery team. In analyzing whether inconsistent defenses confused a jury to such a degree as to warrant a finding of compelling prejudice, we have recognized two general rules-of-thumb. The first is that the admitted possibilities of confusion inherent in a multicount and multidefendant prosecution can be significantly alleviated if the trial judge is careful to instruct the jury that it must consider the evidence against each defendant on a separate and independent basis. Marszalkowski, 669 F.2d at 661; Phillips, 664 F.2d at 1017. The second is that if the verdict itself suggests that the jury carefully sorted the evidence, as when it acquits on certain counts, a conviction will be upheld. Phillips, 664 F.2d at 1017; Tillman, 406 F.2d at 936.
 
 
 14
 Both factors are present in this case. At the beginning of his charge to the jury the trial judge carefully emphasized the jury's responsibility to give separate consideration to each defendant on each count of the indictment. He repeated this admonition again in his conclusion, using language specifically approved by this court in Marszalkowski, 669 F.2d at 661 & n. 4.[3] The fact that the jury acquitted Earl Boyington, Lemar's father, on both counts of the indictment suggests that the jurors took these instructions to heart. For these reasons, the claim of the four remaining Florida defendants that their joinder with the Gulf Shores group made it impossible for them to receive a fair trial must be rejected. We find James Gustin's claim to be unpersuasive for similar reasons. His defense obviously was not irreconcilable with the parallel entrapment defenses offered by Lowe and Walker, and the trial judge's explicit warning to the jury was sufficient to cure any lingering possibility of prejudice or confusion.
 
 B. Other Pretrial Issues
 1. Alleged Brady Violations
 
 15
 Appellant Gustin also contends that he was denied a fair trial as a result of government violations of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Gustin asserts that the government should have specified that James Parker would testify against him, rather than simply naming Parker as one of the witnesses who would testify at trial. He also argues that the government improperly failed to notify the defense that Carlisle, the government's chief witness, could expect to benefit financially from an Alabama statute providing that individuals who supply information in drug prosecutions may receive a percentage of the value of any property condemned as a result.[4] Upon examination, we conclude that neither of these claims establishes a Brady violation.
 
 
 16
 Essential to a claim under Brady is a showing that (1) the government suppressed or withheld requested evidence that was both (2) favorable and (3) material to the defense. Moore v. Illinois, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 2568-69, 33 L.Ed.2d 706 (1972). Since Parker's testimony was not favorable to the defense and the government did not suppress the fact that he would be testifying at trial, we must look to the pretrial orders of the trial court, rather than to Brady, for any government violation. Item # 26 of the disclosure motion filed by Gustin's attorney requested simply the names, addresses and telephone numbers "of all witnesses who will testify on behalf of the prosecution at trial," so the information supplied by the government in fact conforms to the terms of the defense request.
 
 
 17
 The so-called "contingency fee" issue can be easily disposed of as well. Carlisle did testify that he understood his arrangement with the Baldwin County sheriff's department to include the possibility of a financial reward along these lines, and this information seems to be covered clearly by item # 45 of the disclosure motion filed on behalf of Gustin. While it is true that under Brady the good faith of the prosecutor in not disclosing information is irrelevant, 373 U.S. at 87, 83 S.Ct. at 1196, Brady does require that the information requested be known to the prosecution. United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); Antone v. Strickland, 706 F.2d 1534, 1544 (11th Cir.1983) (Kravitch, J., concurring specially). While that knowledge may be presumed, as when the information is in the prosecutor's files, see Agurs, 427 U.S. at 110, 96 S.Ct. at 2400, we do not believe that knowledge of any deal between state officials and Carlisle can be imputed to the federal prosecutor.
 
 
 18
 Nor was any omission sufficiently material under Agurs to require a new trial. Agurs provides that when the prosecution has not disclosed information despite a specific request by the defense, the standard of materiality is whether the suppressed evidence might have affected the outcome of the trial. Agurs, 427 U.S. at 104-06; United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.1983).[5] In this case, however, the relevant information was brought out and ably developed during the cross-examination of Carlisle, and the defense attorneys were fully able to make whatever use of it they desired during their closing arguments to the jury. We therefore need not be detained by speculation as to whether a jury "might" have been influenced by these facts. See United States v. Bruner, 657 F.2d 1278, 1288 (D.C.Cir.1981) (failure to disclose indictment of witness did not require reversal when defense learned of evidence during trial). The jury understood the possible financial rewards that Mr. Carlisle might derive from the successful completion of his mission, and this knowledge evidently did not affect their judgment of his credibility on the entrapment issue. Gustin's claim of error on this ground is therefore without merit.
 
 2. Failure to hold a James hearing
 
 19
 Appellants Lightbourne, Dukes, and Lemar Boyington also challenge the failure of the trial judge to hold a pretrial James hearing on the issue of the admissibility of various statements by their alleged coconspirators. See United States v. James, 590 F.2d 575 (5th Cir.) (en banc), cert. denied, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). In addition, they allege that the trial court "neglected and failed at any time" to make the necessary determination that the appellants were members of a conspiracy and that the statements were made "during the course and in furtherance of the conspiracy" as required under Fed.R.Evid. 801(d)(2)(E).
 
 
 20
 From our examination of the record, it appears that neither Lightbourne's nor Boyington's trial counsel ever raised the hearsay issue below. Prior decisions of this court have established that "[i]n the absence of plain error, hearsay that is not properly objected to is ordinarily admissible at trial for any relevant purpose and may be considered by the jury to the extent of its probative value." Phillips, 664 F.2d at 1026; see also United States v. Leaman, 546 F.2d 148, 150 (5th Cir.), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977).
 
 
 21
 As for Dukes, it appears that his attorney raised the hearsay issue in pretrial proceedings, at the close of the government's case, and again before the case went to the jury, but failed to make any contemporaneous objections as the testimony was actually being given. This absence of any contemporaneous objection alone is sufficient to affirm the trial court, Phillips, 664 F.2d at 1026 & n. 83, but in addition the trial judge expressly made the necessary findings, in relation to Dukes, at the close of the evidence.
 
 
 22
 Even if Dukes' objections were considered sufficient, the trial judge's decision not to determine the admissibility of the coconspirator statements in a pretrial James hearing clearly is not reversible error. Since the appellants' misreading of James is a common one, however, it may be useful if we once again summarize exactly what James does and does not require.
 
 
 23
 In James, the former fifth circuit was squarely confronted for the first time with the need to reconcile the common law governing the admissibility of coconspirator hearsay with the requirements of the newly effective Federal Rules of Evidence. Before the Federal Rules were promulgated, the judge and jury shared the responsibility for deciding whether coconspirator hearsay could be considered. The judge first decided whether there was sufficient independent evidence to establish that a conspiracy existed and that both the declarant and the defendant against whom the hearsay was offered were members of the conspiracy. Once the court found that the government had established this prima facie case, see United States v. Oliva, 497 F.2d 130, 132-33 (5th Cir.1974), the court instructed the jury that it could consider the hearsay only if it found that a conspiracy existed, that the declarant and defendant in question were members, and that the statement was made during the course of and in furtherance of the conspiracy. See, e.g., United States v. Lawson, 523 F.2d 804, 806 (5th Cir.1975). The James court ruled that under Fed.R.Evid. 104(a) the trial judge has the exclusive responsibility to determine the admissibility of coconspirator hearsay, 590 F.2d at 579-80, and then went on to note that:
 
 
 24
 [T]he present procedure warrants the statement of a preferred order of proof in such a case. The district court should, whenever reasonably practicable, require the showing of a conspiracy and of the connection of the defendant with it before admitting declarations of a coconspirator. If it determines it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up.
 
 
 25
 590 F.2d at 582 (emphasis added).
 
 
 26
 James therefore suggests that a pretrial or in camera proceeding is the best way to handle a coconspirator hearsay question, but it clearly does not establish that this is the only way to do so. By permitting the trial judge to admit coconspirator hearsay subject to later proof that a conspiracy did in fact exist, the James court demonstrated that it did not intend to eliminate the traditional discretion of the trial court in this regard. Recognizing, however, that this approach raises the possibility of "injecting the record with inadmissible hearsay in anticipation of proof of a conspiracy which never materializes," United States v. Macklin, 573 F.2d 1046, 1049 n. 3 (8th Cir.), cert. denied, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978), the James court did require the trial judge on motion to make a second determination at the close of the evidence as to whether the prosecution has demonstrated by a preponderance of the evidence independent of the hearsay itself that the traditional requirements of admissibility have been met. If the court determines that the government has not met its burden, it holds the choice of either striking the evidence and giving a cautionary instruction to the jury or declaring a mistrial. 590 F.2d at 582-83.
 
 
 27
 Thus, contrary to the suggestion in appellants' brief, this court has repeatedly emphasized that "James established no inflexible rule that a hearing must be held.... A judge may mold to the circumstances of each case the procedures for showing that a conspiracy existed if he finds a hearing not reasonably practical." United States v. Miller, 664 F.2d 826, 827-28 (11th Cir.1981). In this case, the trial judge had already heard all the evidence that was presented in the first trial of these defendants, and he could reasonably conclude that holding a James hearing would add nothing while wasting the time of all the parties involved. United States v. Ricks, 639 F.2d 1305 (5th Cir. Unit B 1981), which the appellants cite in support of their argument, is in fact strong support for the trial court's decision. In Ricks this court upheld the trial judge's refusal to grant a pretrial James hearing when he had already heard all the evidence while presiding over the separate trials of two other members of the same conspiracy. 639 F.2d at 1310 & n. 1. Under these circumstances we cannot conclude that the failure to hold a pretrial James hearing constitutes reversible error.
 
 C. Sufficiency of Evidence
 1. Directed Verdict Request
 
 28
 Appellants Lightbourne, Dukes, and Lemar Boyington also contend that the trial judge erred by not granting their motions for a directed verdict of acquittal on both counts of the indictment. They argue that the conspiracy conviction must fail because there was no direct evidence of an agreement for criminal purposes between the Gulf Shores defendants and themselves, and that their conviction for possession with intent to distribute must be invalidated because the evidence failed to establish that they knew what was inside the opaque plastic bags that contained the contraband.
 
 
 29
 When analyzing challenges to the sufficiency of the evidence in a criminal case, the standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." United States v. Bell, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), aff'd, --- U.S. ----, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In prosecutions for conspiracy to distribute narcotics under 21 U.S.C. Sec. 846, the essential element is an agreement by two or more persons to violate the drug laws. United States v. Tamargo, 672 F.2d 887, 889 (11th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982). The existence of such an agreement may be proved by either direct or circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." United States v. Ayala, 643 F.2d 244, 248 (5th Cir. Unit A 1981). A defendant may be found guilty of conspiracy if the evidence demonstrates that he knew the essential objective of the conspiracy, even if he did not know all its details or played only a minor role in the overall scheme. United States v. Alvarez, 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), cert. denied, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).
 
 
 30
 The evidence presented in this case was clearly sufficient to meet the government's burden under these standards. Jerry Lowe testified on cross-examination that he called Lemar Boyington in an effort to locate some marijuana to sell Carlisle and that Boyington eventually informed him that he could produce between three and four hundred pounds. Lowe also testified that he drove the U-Haul truck which Carlisle had brought him to use in transporting the marijuana to Pensacola, where he met Boyington in a parking lot and gave him the keys. Boyington subsequently drove the truck to the rendezvous with Lowe and Agent Kirspel in a secluded area off I-10, followed closely by the three other Florida defendants in a car with the marijuana. The government also introduced a tape recording into evidence in which Gustin explained to Carlisle that the delivery of the marijuana would be delayed because his accomplices had been forced to take a longer route to avoid a weigh station along the highway. Upon their arrival at the rendezvous site, Lightbourne, Durden, and Dukes immediately began unloading bales of marijuana from the trunk of the car into the back of the truck. The logical inference to be drawn from these facts is that the Florida defendants understood that their purpose that night was to consummate an illegal narcotics deal.[6]
 
 
 31
 Since the evidence does suggest that the Florida defendants understood the essential objective of the conspiracy, the fact that only Boyington had direct contacts with the Gulf Shores defendants is of no significance. Where the evidence establishes that the defendants "knew or must have known that others unknown to them were sharing in so large a project ... it can hardly be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly what parts they were playing in carrying out the common design and object of all." Blumenthal v. United States, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947); see also United States v. Prescott, 672 F.2d 882, 886 (11th Cir.1982).
 
 
 32
 We therefore conclude that there was "substantial evidence" to support the jury's decision to convict these defendants on both the conspiracy and the possession count. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 
 2. Entrapment as a Matter of Law
 
 33
 Appellants Gustin and Lowe argue on the basis of Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) and Williamson v. United States, 311 F.2d 441 (5th Cir.1962), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 724 (1965) that the trial judge erroneously failed to find that the evidence established entrapment as a matter of law. Lowe argues that the evidence clearly showed that he was offered various inducements to participate in the transaction and contends that James Parker, the rebuttal witness who testified against him on the issue of predisposition, simply was not credible. Gustin similarly contends that he was induced to participate and also claims that the government had a "contingency fee" arrangement with Carlisle that mandates dismissal of the charges against him.
 
 
 34
 Although Gustin and Lowe claim that the evidence establishes the existence of entrapment as a matter of law, their arguments in fact reflect two different justifications for barring prosecution on the grounds of governmental misconduct. In Sherman, the Supreme Court did recognize that there might be situations in which the uncontroverted evidence presented at trial established entrapment as a matter of law. 356 U.S. at 373, 78 S.Ct. at 821. Williamson, on the other hand, is not really an entrapment case at all, since there was little question that the defendants in Williamson were predisposed to commit the crimes for which they were convicted. The court instead reversed their convictions on the grounds that the government's action in devising "a contingent fee agreement to produce evidence against particular named defendants as to crimes not yet committed" constituted a violation of fundamental fairness. 311 F.2d at 444.
 
 
 35
 Neither Sherman nor Williamson is applicable to the facts presented in this case. The Sherman Court emphasized that "we are not choosing between conflicting witnesses, nor judging credibility.... We reach our conclusion from the undisputed testimony of the prosecution's witnesses." 356 U.S. at 373, 78 S.Ct. at 821. This case, in contrast, presented sharp conflicts between the testimony offered by Carlisle and Lowe on a number of key points. The government also presented rebuttal evidence against Lowe on the issue of predisposition; although Lowe asserts that the testimony of the rebuttal witness was not credible, Glasser requires us to accept his testimony at face value. 315 U.S. at 80, 62 S.Ct. at 469. We therefore cannot find that the evidence in this case was such as to mandate a finding that entrapment existed as a matter of law with respect to appellant Lowe.
 
 
 36
 Gustin likewise does not have a persuasive claim for relief under Sherman. There were sharp conflicts between his testimony and that of Carlisle on a variety of points; moreover, although the chronology is not entirely clear, Gustin apparently agreed to find some marijuana for Carlisle within two or three days of their initial meeting at the Bear Point Marina. These facts stand in marked contrast to those in Sherman, in which the defendant did not acquiesce until repeated requests had been made over a lengthy period. In addition, the government presented substantial rebuttal evidence suggesting that Gustin's involvement with narcotics trafficking was nothing new. See United States v. Goodwin, 625 F.2d 693, 698 (5th Cir.1980).
 
 
 37
 Gustin urges that his conviction should be invalidated under Williamson because he was a victim of a "20th century bounty man." The basis for this claim is Carlisle's testimony that, in addition to his regular salary, he was told by state officials that he could receive 25% of the value of any property confiscated, under an Alabama statute providing for the payment of rewards to citizens supplying information leading to a narcotics conviction. This arrangement is clearly distinguishable from that condemned by the Williamson court, since Carlisle was not told that his reward was dependent on making a case against particular individuals specified in advance. His first contacts with Gustin, Walker, and Lowe did not come about at the direction of law enforcement officials, but through Michael Miceli, who did not know that Carlisle was a government agent. Moreover, the statute at issue here is applicable to anyone who supplies information, and there are strong public policy justifications for permitting law enforcement officials to offer additional incentives to encourage citizens to come forward with knowledge of crimes. Nor can we agree, as Gustin suggests, that the $3400 salary paid Carlisle for his work in this case was so excessive that he was driven to make a case against the defendants by any means necessary. A similar argument was rejected in United States v. Gray, 626 F.2d 494 (5th Cir.1980), cert. denied, 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981), in which the former fifth circuit stated that "[a]lthough high informant fees [in that case, $37,000 and $25,000] are and must be suspect, an informant's testimony will not be rejected unless there is evidence that he was promised payment contingent upon the conviction of a particular person." Id. at 499. Since that circumstance was not present in this case, the trial judge was clearly correct in sending the entrapment issue to the jury.
 
 D. Jury Instructions
 1. Walker
 
 38
 Appellant Walker raises a number of objections to the jury instructions employed by the trial judge. He argues that the district court erred by instructing the jury that inducement for entrapment purposes requires "persistent recruitment pressure"; by failing to properly instruct the jury on the issue of criminal intent; and by denying his request for an instruction defining the terms "agent" and "agency." We find no merit to any of these contentions.
 
 
 39
 Walker first asserts that it was error for the trial judge to instruct the jury that "before you can find that the government induced a defendant to commit a crime alleged in count one or count two of the indictment, you must find persistent recruitment pressure on the part of the government or a government agent." Walker argues that this language is an erroneous statement of the law, since it suggests that only one type of conduct can constitute an inducement. Although many courts do not use the language employed by the trial court here,[7] we cannot conclude that under the circumstances of this case this charge is an incorrect statement of the law. The essence of entrapment is that there must have been "some showing of the kind of conduct by government agents which may well have induced the accused to commit the crime charged." Lopez v. United States, 373 U.S. 427, 435, 83 S.Ct. 1381, 1385, 10 L.Ed.2d 462 (1963). The former fifth circuit has noted that " 'inducement' represents more than mere suggestion, solicitation, or initiation of contact and, in fact, embodies an element of persuasion or mild coercion ...." United States v. Hill, 626 F.2d 1301, 1304 (5th Cir.1980).
 
 
 40
 Walker contended that he was entrapped by what amounted to persistent recruitment pressure including four meetings with Carlisle, during each of which Carlisle played upon Walker's own financial interests and his friendship with Gustin. The trial judge paraphrased the Hill language in his charge and in a manner responsive to defendants' contention seems to have used the phrase "persistent recruitment pressure" as a form of shorthand for the fuller definition. Walker suggests that there might be instances when the magnitude of the inducement offered is such that the will of a law-abiding citizen could be overborne even without "persistent recruitment pressure." The inducements Carlisle offered to Walker in the present case hardly rise to this level.
 
 
 41
 This court has held that " 'so long as the charge accurately reflects the law and the facts, the district judge is vested with broad discretion in formulating his charge.' " United States v. Borders, 693 F.2d 1318, 1328-29 (11th Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1875, 76 L.Ed.2d 807 (1983) (quoting United States v. Ruppel, 666 F.2d 261, 273-74 (5th Cir. Unit A), cert. denied, --- U.S. ----, 103 S.Ct. 17, 73 L.Ed.2d 1402 (1982)). Because the law of entrapment is predicated on the reasonable assumption that law-abiding citizens have the strength of will necessary to resist ordinary temptations, we cannot conclude that the use of the phrase "persistent recruitment pressure" constituted an abuse of the district court's broad discretion in this regard.
 
 
 42
 Walker also contends that the district court erred by failing to instruct the jury in accord with his proposed instructions # 2, # 4 and # 6. The phrasing of Walker's proposed charges parallels, but does not exactly duplicate, the Supreme Court's language in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), in which Chief Justice Hughes noted that entrapment exists "when the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Id. at 442, 53 S.Ct. at 212. We perceive no critical difference between the language of Walker's proposed charge # 4 and that of the Supreme Court in Sorrells. Although Walker's proposed charge correctly states the law, and similar language has been employed by many other courts in entrapment cases, it does not necessarily follow that the trial judge was required to use this precise language in his instructions to the jury. A trial judge's refusal to deliver a requested instruction constitutes reversible error only if the instruction is substantively correct and (1) it was not substantially covered in the charge actually delivered to the jury and (2) the failure to give it seriously impaired the defendant's ability to present an effective defense. United States v. Grissom, 645 F.2d 461, 464 (5th Cir. Unit A 1981). The trial judge here apparently sought to render the Sorrells formulation into everyday language, instructing the jury that "[i]n laymen's terms, you can think of the defense of entrapment this way: yes, I committed the acts which the government charges, but I was induced into committing those acts by the government when I would not otherwise have committed the acts, because I am not predisposed to distributing marijuana or possessing marijuana with intent to distribute it or to conspire to do those things." Although it might have been preferable for the trial judge to utilize the Sorrells language as well, we believe that the formulation employed by the trial judge conveyed the essential idea and does not constitute reversible error.
 
 
 43
 Walker's final complaint concerns the failure of the trial judge to define the terms "agent" and "agency." Walker's counsel suggested at oral argument before this court that the instruction was necessary for the jury to understand that Gustin, who originally brought Walker into the transaction, could have been considered an "agent" of the government for entrapment purposes. Although some commentators have expressed concern about the role of middlemen in entrapment cases, see, e.g., Note, Entrapment Through Unsuspecting Middlemen, 95 Harv.L.Rev. 1122 (1982), this circuit has clearly rejected the suggestion that entrapment can arise vicariously. United States v. Mers, 701 F.2d 1321, 1340 (11th Cir.1983). Walker was entitled to have his entrapment defense considered by the jury on the basis of his contacts with Carlisle and the government officials, and this was accurately reflected by the trial judge's instructions specifying that Carlisle, Lasseter, and Kirspel should be considered as government agents for purposes of the jury's deliberations on the entrapment issue.
 
 2. Lowe
 
 44
 Appellant Lowe raises two complaints about the jury instructions utilized by the trial court. He contends that the charge failed to spell out adequately for the jury that the government had to disprove Lowe's claim of entrapment beyond a reasonable doubt and asserts further that the trial judge committed error in charging the jury that the defendants could be found guilty on count two if they were found to have aided and abetted the conspiracy. We have reviewed the instruction and cannot conceive how the trial court could possibly have made this point any clearer.
 
 
 45
 Lowe's argument on the aiding and abetting issue is equally unpersuasive. He contends that the trial court's charge may have permitted the jury to find him guilty of conspiracy without finding that he had actually entered into an agreement with the other parties. The argument that supplying an instruction on aiding and abetting improperly reduces the government's burden of proof on conspiracy has been decisively rejected by this court. United States v. Walker, 621 F.2d 163, 166-67 (5th Cir.1980), cert. denied, 450 U.S. 1000, 101 S.Ct. 1707, 68 L.Ed.2d 202 (1981); see also United States v. Pearson, 667 F.2d 12 (5th Cir. Unit B 1982). The trial judge's instructions correctly stated the elements of conspiracy and emphasized that the evidence must show "that two or more persons in some way or manner positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan ...." Appellant Lowe's claims are therefore without merit.
 
 III. Conclusion
 
 46
 After a careful review of the record in the district court, we are convinced that each of these defendants received a fair trial. The convictions and sentences imposed on appellants Walker, Lowe, Gustin, Durden, Dukes, Lightbourne, and Lemar Boyington are therefore
 
 
 47
 AFFIRMED.
 
 
 
 *
 Honorable Luther M. Swygert, U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 We remind defense counsel that 11th Cir.R. 22(f)(7)(ii) states that "[a] proper statement of facts reflects a high standard of professionalism. It must state the facts accurately, those favorable and those unfavorable to the party." In reviewing challenges to the sufficiency of the evidence to support a conviction, we are, of course, required to view the evidence in the light most favorable to the government, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and all credibility choices and inferences must be made in support of the jury's verdict. United States v. Sink, 586 F.2d 1041 (5th Cir.1978), cert. denied, 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979)
 
 
 [2]
 The ninth circuit stated these considerations succinctly in Parker v. United States, 404 F.2d 1193 (1968), cert. denied, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969), when it noted:
 [Joinder] expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once.
 Id. at 1196.
 
 
 [3]
 The trial judge instructed the jury that "a separate crime or offense is charged, as I have said, against each of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the offenses charged should not control your verdict as to any other offense or as to any other defendant."
 
 
 [4]
 Act No. 81-678, 1981 Ala.Acts 1109 provides in pertinent part:
 The sheriff's department of Baldwin County shall receive 25% of the proceeds of the sale of property confiscated under Section 20-2-93, Code of Alabama 1975, known as the Controlled Substances Act. Said percentage shall be computed from the sum remaining after the payment of all proper expenses of the proceedings for forfeiture and sale, as provided by Section 20-2-93(e)(2). The money received by the sheriff's department pursuant to this act shall be placed in a separate fund to be used to pay drug informants whose information leads to the conviction of an individual for a drug offense.
 
 
 [5]
 In Garrison v. Maggio, 540 F.2d 1271 (5th Cir.1976), cert. denied, 431 U.S. 940, 97 S.Ct. 2655, 53 L.Ed.2d 258 (1977), this court recognized the existence of a fourth level of materiality in addition to the three specified by the Supreme Court in Agurs. The Garrison court ruled that when the prosecutor fails to disclose purely impeaching evidence not concerning a substantive issue in the absence of a specific defense request, a new trial will not be granted unless the defendant can demonstrate that the undisclosed evidence probably would have resulted in acquittal. See also United States v. Anderson, 574 F.2d 1347, 1354 (5th Cir.1978). In this case, Gustin's attorney specifically requested "[t]he complete details of any agreement or understanding, whether written or unwritten, between the prosecution or any law enforcement agents of any jurisdiction and any witness who will testify for the prosecution at this trial, as it concerns any of the following in exchange for the witness' testimony: ... (c) monetary consideration ...." The government's failure to comply with the terms of Gustin's discovery requests therefore must be treated under the second of the three levels of materiality set forth in Agurs, rather than the more restrictive Garrison standard. See also Ogle v. Estelle, 641 F.2d 1122, 1125 (5th Cir. Unit A 1981). The statement in Phillips, 664 F.2d at 1026, that the Garrison-Anderson standard applies to situations where there has been a specific request for purely impeaching evidence is apparently a proofreader's error; the standard is correctly described on the preceding page
 
 
 [6]
 The trial judge clearly instructed the jury that "mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find, beyond a reasonable doubt, that the defendant was a participant and not merely a knowing spectator. You should not find any defendant guilty of any crime charged solely by virtue of presence, association, or knowledge." We must therefore infer that the jury considered the defense raised by the Florida defendants and found it unpersuasive
 
 
 [7]
 See, e.g., United States v. Burkley, 591 F.2d 903, 914 (D.C.Cir.1978), cert. denied, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979) (approving jury instructions that define "inducement" as "persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, pleas based on need, sympathy, or friendship, or any other government conduct that would create a risk of causing an otherwise unpredisposed person to commit the crime charged.")