LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on a trial on an indictment that charged in pertinent part that he:
“did, in the course of committing a theft of, to-wit: approximately $700.00 to $900.00 in the lawful currency of the United States of America ..., the property of Othanell Holcombe, use force or threaten to use force against the person of Othanell Holcombe, or against another person present, or did aid and abet in using force against the person of Otha-nell Holcombe with intent to overcome her physical resistance or physical power of resistance, while the defendant or another participant, Sylvester Mixon or Phillip Mixon, was armed with a deadly weapon or hazardous instrument, to-wit: a pistol, or did aid and abet in said act ... contrary to and in violation of § 13A-8-41(a)(l). Code of Alabama 1975.”
On the cover page of the brief of counsel for appellant and on the cover page of the brief of counsel for appellee, the case is stated to have been “Appealed from the Circuit Court of Jefferson County, Alabama.” This incidentally produced some disorientation of the writer upon his reading from the court reporter’s transcript of the trial that the alleged robbery occurred in the home of the alleged victim on Highway 25 in Shelby County between Colum-biana and Calera, until thereafter noting from the record proper and the complete transcript of the proceedings, as well as from the remainder of the briefs of counsel, that the appeal is from the Circuit Court of Shelby County, Alabama. We now refer to some of the testimony of the alleged victim that pertains to some of the few issues presented on appeal.
Mrs. Holcombe, the victim, testified that on the evening of February 18, 1983, she arrived at her home at 8:15 and, while *271 watching a television program between 8:30 and 9:00, she heard a noise “outside the kitchen door,” that she then turned the light on outside and “saw two black males with something similar to a pillow case,” with the eyes cut out, over their head, who broke into the house, bound her hands and her feet, started looking through the house, and one of them “pulled out a pistol and asked her where was her pistol.” She further testified that she told him she did not have a pistol and that one of them pointed a pistol at her, pulled the trigger and it clicked. Some of her testimony was as follows:
“A. The one that pulled the pistol on me went back through the hall to the bedroom and was looking again. The other individual saw my purse sitting on the table and started to looking through it.
“Q. What, if anything, occurred after that?
[[Image here]]
“Q. All right. And what, if anything, did you observe this individual doing with your purse?
“A. He was emptying everything out of it.
“Q. All right. What, if anything, happened after he emptied all the contents out?
“A. After he had found some money, he called to the one that was back in the bedroom and said something that sounded like, ‘Hey, Doug, I found it.’
“Q. All right. Did you have any money in your purse?
“A. I had somewhere between seven and nine hundred dollars.
[[Image here]]
“Q. All right. Did you ever have an occasion to hear a conversation between these two assailants?
“A. When they were tying me up, one was just saying to the other one, have you got her, or something to that effect. That was the main talking that they were doing.
[[Image here]]
“Q. All right. Did you have occasion to identify any of the voices of the individuals involved?
“A. When he had the pistol on me, I knew it was Otis Chapman, Junior.
“Q. All right. Have you ever had an occasion to have a conversation with Otis Chapman, Jr., before?
“A. We opened our store in 1979 and over the years he was in the store sometimes two sometimes three, sometimes at least once a week. Sometimes every day of the week.
“Q. And it is your testimony that the gentleman who pointed the pistol at you, you identified his voice as being Otis Chapman?
“A. Yes, sir.
“Q. Is Otis Chapman in the courtroom today?
“A. Yes, sir.”
During the remainder of the testimony of Mrs. Holcombe, she stated that when the robbers had left her house she managed by struggling to remove the tapes with which she had been bound and that, knowing that the telephone line had been cut by her robbers, she managed to drive next door, which was the home of her brother-in-law, and they telephoned her husband, who immediately left his store at Columbiana and came to the scene of the crime. The victim testified that when the officers came and asked her if she recognized anything about any of the robbers she stated that one of them “sounded like Otis Chapman, Jr.” On cross-examination, she said that one of the officers asked her as to whether there was “anything about any of them that I recognized and I told him — and I said I used the term that it sounded like Otis Chapman, Jr. because I believed it to be Otis Chapman, Jr.” On Cross-examination by the attorney for defendant Phillip Mix-on, the victim testified that she did not know who was the other person that was in her house taking part in the robbery.
We believe we have set forth enough in the foregoing recital of the testimony of the victim of the robbery to show the strength of the case against the defendant *272 as one of the participants, and that for the purpose of consideration in connection with the main issues presented by appellant we need only to say that there was also strong evidence on the part of other witnesses for the State to the effect that defendant was one of the two participants in the robbery who were inside the house at the time the money was taken from Mrs. Holcombe. Before commencing our discussion of the principal issues presented on appeal, we think we should state that a separate indictment for the same alleged crime had been returned against each of three persons, including this appellant, and Sylvester Mixon and Phillip Mixon.
We deem that the paramount issues as to which appellant and appellee are in disagreement pertain to the action of the trial court in consolidating for trial the cases against Otis Chapman, Jr., and Phillip Mix-on and the subsequent action of the trial court in severing from such consolidated cases the case against Phillip Mixon when it became known that Phillip Mixon desired to change his plea from a plea of not guilty to a plea of guilty. It appears from the lengthy four volumes of the transcript, inclusive of the record proper, that, about four months before the trial of the two consolidated cases commenced, the trial court, over the objection of defendant, granted the State’s motion for a consolidation of the cases. The record shows that in the objection of this appellant to the motion of the State for a consolidation of the two cases for trial, there was the following averment:
“2. That the two (2) Co-Defendants, namely Sylvester Mixon and Phillip Mix-on are brothers and both gave detailed statements and/or confessions to the Shelby County Sheriffs Department. The said statements and/or confessions are attached hereto for the court’s perusal and information as provided by Rule 15.4(e) of the Alabama Rules of Criminal Procedure.”
It is further contended in brief of counsel for appellant that the trial judge “granted the State’s motion ... without ever even reading the statements of Chapman’s Co-Defendants” and that such “effectively demonstrates that the Defendant was denied the right to be heard on his objection to” the consolidation, “as provided by Rule 15.4(b) of the Alabama Rules of Criminal Procedure, which is as follows:
“CONSOLIDATION. If defendants are charged in separate indictments, infor-mations, or complaints, the court, on its own initiative or on motion of any party, may, no later than 7 days prior to trial, order that the defendants be joined for the purpose of trial if the defendants could have been joined in a single indictment, information, or complaint. Proceedings thereafter shall be the same as if the prosecution initially had been under a single indictment, information, or complaint. However, the court shall not order that the defendants be tried together without first providing the defendants and the prosecutor an opportunity to be heard. [Emphasis supplied.]”
In support of the contention in brief of counsel for appellant that the trial judge never read the statements of Chapman’s co-defendants prior to the time the State’s motion for consolidation was granted, appellant’s counsel relies upon a dialogue between him and the trial judge on the first day of the trial during an in camera hearing prior to the selection of the jury, in which the following was stated:
“MR. BLALOCK: Has the Court had an opportunity to see the written confession of Phillip Mixon?
“THE COURT: No.”
Although we are unwilling to agree fully with the contention of appellant's attorney that the failure of the trial judge to see the written confession of Phillip Mixon was the equivalent of the trial court’s not “providing Defendant Chapman with an opportunity to be heard,” as provided by the last sentence as quoted and emphasized above of Rule 15.4(b) of the Alabama Rules of Criminal Procedure, we are of the opinion that the failure of the trial judge to read the proffered statement tends to strength *273 en appellant’s contention that the two cases should not have been consolidated.
It is also contended in appellant’s brief that as “Rule 15.4 of the Alabama Rules of Criminal Procedure did not become effective until March 1, 1983, “the trial in the instant case commencing in the first week in December 1983, should have been conducted in accordance “with Helums v. State, 23 Ala.App. 401, 126 So. 183 (1930), “in which the entire opinion by Judge Sam-ford is as follows:
“This appeal is on the record which discloses that this defendant was alone indicted and tried jointly with another separately indicted and charged with the same offense. There is nothing in the record to show that the joint trial was with the consent of defendant or that he had waived the right to a separate trial. Being separately indicted, the defendant is entitled to a separate trial, and a joint trial with another without the consent of the defendant or a waiver of the right by him appearing in the record is error and cause for reversal. Martin v. State, 19 Ala.App. 432, 97 So. 768.
“Reversed and remanded.”
This contention of appellant’s attorney is inconsistent with what was held in Holsemback v. State, 443 So.2d 1371 (Ala.Cr.App.1983), wherein it was stated at 443 So.2d 1376, 1377, that, as shown by a number of authorities, “the consolidation of one defendant’s case with that of another defendant is a matter of procedure.”
The case of Holsemback v. State, which we have just cited, constitutes not only an answer to the contention of appellant’s attorney that we have determined adversely to him; it also contains a most thorough and scholarly discussion of the circumstances that justify the consolidation of criminal cases against two or more defendants as contrasted with circumstances that do not justify a consolidation. It is clear therefrom that, although Rule 15.4(b) is a procedural rule, there are situations in which the substantive rights of a case against a defendant would be violated by a consolidation of his case, over said defendant’s objection, with a case against another defendant for the same crime for which both are being prosecuted. Presiding Judge Bowen in Holsemback v. State cites and discusses a large number of cases from the federal appellate courts of the United States, some holding that the substantial rights of the defendant have not been violated and others holding that the substantial rights of a defendant have been violated by a consolidation. We should consider and determine on the basis of the opinion in the case of Holsemback whether substantial rights of this appellant were impaired to his prejudice by the consolidation over his objection of the case against him and the case against Phillip Mixon.
The second witness who testified on the trial of the case was Mr. B.H. Holcombe. He testified that he had a “business relationship” with the defendant Chapman for at least a year, that Chapman was in his place of business at Columbiana “one, two and three times a day for months, or longer,” prior to the date of the robbery of the wife of Mr. Holcombe. He said that on the evening of February 18, 1983, at “approximately seven or seven-thirty,” the defendant Chapman came into the store and cashed a check for Two Hundred and Fifty Dollars. He also testified that after he received the telephone call as to what had happened to his wife at their home, he promptly went in his truck toward his home, and he described the condition of his home that had been broken into. He further testified on direct examination as follows:
“Q. All right. Specifically I would like to ask you about that period of time when you traveled in your red truck from your place of business in Columbia-na to your residence. Do you recall that trip?
“A. Yes, sir.
“Q. Do you recall whether or not you had an opportunity to observe any other traffic on the road?
“A. Just one vehicle that passed me.
“Q. And what kind of vehicle was that, please, sir?
*274 “A. Pontiac Grand Prix.
“Q. And could—
“A. Silver with a half-vinyl red top on it.
“Q. Did you have an opportunity to— could you identify that vehicle at that time?
“A. I sure could.
“Q. And whose—
“A. I said in my mind who it was and I wondered why he was down there going that fast.
[[Image here]]
“Q. Could you identify the vehicle that passed you at that time?
“A. I sure could.
“Q. Whose vehicle was that, please, sir?
“A. Otis Chapman, Jr.’s car.”
On voir dire examination by counsel for defendant appellant, Mr. Holcombe testified as follows:
“Q. How fast was that car going?
“A. It was going approximately ten miles an hour faster than I was and I was going close to seventy.
“Q. All right. So you were going toward your house. Which way was this car going?
“A. He was going the same way.
“Q. He was going toward your house also?
“A. That’s right.
“Q. And he passed you?
“A. Right.
“Q. Going approximately eighty miles per hour?
“A. Seventy-five to eighty, yes, sir.”
The first witness called by the State after Mr. Holcombe was Mr. Sylvester Mix-on, who immediately in response to the first questions asked him by State’s attorney replied that he wished to take the Fifth Amendment, and he did not testify.
The next witness for the State was Officer Michael Smitherman of the Shelby County Sheriff’s Department, who identified some pillow cases that were removed from beside the dirt road in front of the Holcombe residence on the morning after the robbery of Mrs. Holcombe. Officer Smitherman was followed as a witness for the State by Officer Charles H. Johnson of the Calera Police Department, who was on duty the night of the robbery sometime after the robbery and who responded to a “BOLO,” a term used for a radio message to “Be-on-the-lookout.” He and others located Otis Chapman, Jr., and took him to the Calera Jail, and his car was impounded. Officer Johnson further testified that he saw the motor vehicle that Sylvester Mixon usually drives and Chapman’s motor vehicle in Calera the night of the robbery sometime between 10:00 and midnight. On cross-examination by the attorney for Phillip Mixon, he answered in the affirmative to the following question, “Officer Johnson, you said you saw them by Otis Chapman’s vehicle, the three individuals, between ten til twelve and twelve fifteen?” The witness for the State following Officer Johnson was Officer Robert Kiker of the Calera Police Department.
Officer Kiker was followed by Officer Richard Fox as a witness for the State. He commenced his testimony by answers to questions by counsel for the State on voir dire examination, stating that he was an investigator for the Shelby County Sheriff’s Department, that shortly after midnight of the night of the robbery of Mrs. Holcombe he interrogated this appellant in Calera, read this appellant his rights and that appellant responded that he understood his rights and would sign a statement to that effect, which he did. The officer testified that this appellant then proceeded to tell him about where he was and what he did on the night of the robbery. The officer did not obtain a written statement, but the officer testified that defendant voluntarily gave him an oral statement in the presence of the witness and in the presence of Officer James Jones. We quote from his testimony on voir dire as follows:
“A. I asked him did he want a lawyer at this time.
“Q. What, if anything, did he say?
“A. At which time he stated he did not.”
*275 The witness continued with his testimony by stating that this appellant was asked by him about his “whereabouts ... earlier that evening” and he said the appellant “told me that he had been at Calera around eight o’clock” and that at that time he met Sylvester Mixon and Phillip Mixon, and the three of them went to Clanton and to a house where they played some cards and drank some beer and returned to Calera about 11:30 that night, where he was picked up by the police. Included in Officer Fox’s testimony was the following:
“A. When I told Otis that his voice had been recognized by the lady that had been robbed, Otis made this statement, ‘Mrs. Holcombe ought to recognize my voice.’
“And when I asked him how did he know Mrs. Holcombe was the one that was robbed, then that is when he said, ‘You told me.’ And I had not told him.
“Then he said that Chief Jones had told him, which he hadn’t in my presence, and Otis denied any knowledge to the robbery.
“Q. Is that the extent of any conversation between you and Otis Chapman?
“A. Yes, sir.
“Q. Was he then put somewhere?
“A. He was retained in jail.”
Officer James Jones of the Shelby County Sheriff’s Department was examined voir dire by the attorney for Phillip Mixon. He said during the lengthy interrogation that he did not recall telling Chapman that Mrs. Holcombe had identified his voice and did not recall “Richard Fox telling him that.” He further stated:
“A. The only thing that I do recall now is his stating that he — I believe when Mr. Fox asked him where he had been, I do recall him saying he had been down into Chilton County, but other than that I don’t recall him saying anything else.
“Q. Do you remember him saying he had been down there drinking some beer?
“A. Yes, sir, he did make that statement.
“Q. Did you smell any alcohol?
“A. Did I smell alcohol?
“Q. Yes, sir.
“A. I don’t recall it.
“Q. Approximately what time was that you returned to the Shelby County Sheriff’s Office?
“A. I would guess somewhere around one o’clock or one thirty.”
For about seventy-five pages of the transcript, there was a continuation of the voir dire examination of the witness James Jones, together with voir dire examination of John Mixon, the father of Phillip Mixon. Some time thereafter and while the jury continued to remain out of the courtroom, it became known to the trial court and the attorneys that defendant Phillip Mixon and his attorney had decided to enter a plea of guilty on behalf of Phillip Mixon. We quote from the transcript as to such action:
“MR. HILL [District Attorney]: Your Honor, at this time we also have a new development in the case.
“We have recently, through some negotiations with the defendant Phillip Mixon and his counsel have entered an agreement to allow a plea of guilty pursuant to an agreement.
“This is the written agreement which we think contains the entirety of our discussion and our agreement and at this time we present it to the Court for its consideration.
“THE COURT: All right. The Court will require that the Ireland form, so-called Ireland Form, be executed by the defendant.
“MR. HILL: All right, sir. Judge, we will be glad to do that at this time. We are not going to take the plea until after he testifies.
“(WHEREUPON, following an off-the-record discussion the following proceedings were then had and done outside the presence of the jury:)
“THE COURT: We will be on the record. In case CC 83-224, the Court being made aware of the fact that the defendant in said case, Phillip Mixon and a co-defendant with the defendant Otis Chapman in *276 case CC 82-225, wishes to enter a plea of guilty—
“MR. SHULEVA [Atty. for defendant Phillip Mixon]: 83-225, Judge.
“THE COURT: All right, 83-225 wishes to enter a plea of guilty pursuant to a plea agreement entered into between the defendant and the State of Alabama.
“The Court addresses itself to Mr. Shule-va, attorney for the defendant. Is this a correct statement of the defendant Phillip Mixon's position?
“MR. SHULEVA: Your Honor, the statement as indicated in the motion to allow a plea of guilt pursuant to an agreement is a correct statement.
“THE COURT: All right. The Court addresses itself to Mr. Hill. What is the agreement between the State of Alabama and the defendant?
“MR. HILL: The State understands that the defendant will offer his plea of guilty to the crime of robbery in the first degree as charged in the indictment.
“Should the defendant be successful in offering this plea the State and the victim in this case recommend a sentence of ten years and one day to be served in the Alabama Penitentiary with the further understanding for the defendant to be called as a witness in the trial of the State of Alabama versus Otis Chapman. The defendant shall testify truthfully.
“THE COURT: All right, bring the defendant before the bar of justice.
“(WHEREUPON, the defendant Mixon was brought before the Court and pleaded guilty to the offense of robbery in the first degree, the usual procedure in a plea to a felony offense being followed by the Court and all parties therein and sentencing set following a pre-sentence investigation for December 19, 1983, the defendant remaining under bond until that time, there being no objection from the State. The following proceedings were then immediately had and done:)
“THE COURT: In the light of the plea of guilty entered by the defendant Phillip Mixon in case CC 83-224, it is here ordered, adjudged and decreed that case number CC 83-224 is severed from the case of CC 83-225 wherein the defendant is one Otis Chapman.
“MR. SHULEVA: Thank you, Judge.
“MR. HILL: Thank you, Judge.
“MR. BLALOCK [Attorney for defendant Otis Chapman]: At this time for the record we would object to any severance of the defendant at this time due to the highly prejudicial nature that will reflect on our client, the fact that the one time co-defendant now all of a sudden, he is no longer participating in this trial and this trial is severed.
“It is our belief that the co-defendant, Otis Chapman, cannot receive a fair trial once he has been severed at this stage of the trial.
“It has gone too far. There has been too much testimony, too much linkage between our client, our defendant, that at one time both people came in presumed innocent.
“The co-defendant all of a sudden changed his horses in midstream admitting his guilt, which reflects a bad light at the very least, and that is using the term lightly, on the part of our client Otis Chapman.
“And we feel like he cannot receive a fair trial at this stage of the game and we move the Court for a mistrial if you decide to sever.
“THE COURT: Your motion for a mistrial is herein denied.
“All right, gentlemen, the Court will take about five minutes’ recess and at twenty minutes until ten the Court will bring the jury for further proceedings in this case.
“MR. BLALOCK: Also, we feel like that severance at this time is going to totally throw us off base in our preparation for the trial of our case for our defendant. “Now we are having to deal with a co-defendant who is now going to testify against our man. It puts us in a position we are not prepared to adequately defend our client to the extent necessary for him to receive a fair trial.
*277 “THE COURT: Are you therefore moving the Court for a mistrial?
“MR. BLALOCK: For a mistrial, also.
“THE COURT: Your motion for a mistrial is denied.
“I’ll wait about bringing the jury in until quarter until ten and give you some additional time.
“The Court stands adjourned — recessed.
“(WHEREUPON, proceedings were in recess from 9:26 A.M. until 9:50 A.M. of the same day, at which time the following proceedings were had and done outside the presence of the jury but in the presence of all parties:)
“THE COURT: Are you ready, gentlemen?
“MR. BLALOCK: Yes, sir.
“THE COURT: Now the Court is about to bring the jury back. Is there anything further before the Court before we bring the jury back?
“MR. BLALOCK: Well—
“MR. TURBEVILLE [Attorney for defendant Otis Chapman]: Your Honor, we ask that, number one, that the investigator for the police department not talk to our witnesses during the trial.
“Number two, not intimidate them.
“Number three, we would ask that the government prosecutor be instructed not to instruct policemen who are also witnesses in the case to go out and talk to our prospective witnesses.
“We say in support of that the fact that the State had subpoenaed someone who we also subpoenaed does not give them carte blanche authority to take them into a closed room without our knowledge, without us being invited to be present, and talk to them in particular, ask them to change their testimony.”
Soon after the occurrence of that which we have last quoted hereinabove, the jury was returned to the courtroom and the following occurred:
“THE COURT: All right. Who will the State’s next witness be?
“MR. HILL: The State calls Phillip Mix-on.
“THE COURT: Ladies and gentlemen, prior to your entering the courtroom, the Court had severed the cases of Phillip Mixon and Otis Chapman. Therefore the State and the defendant Otis Chapman only will proceed with the trial of this case but you will not be concerned with Phillip Mixon as a defendant because, as I have stated to you, the Court has severed his case.
“All right, you will bring the witness in, please?
“MR. PHILLIP MIXON
“Was sworn and testified as follows:
“DIRECT EXAMINATION
[[Image here]]
“Q. All right. And I understand through your counsel, Mr. Shuleva who is present in the courtroom today—
“A. Yes, sir.
“Q. —that you have negotiated an agreement with the State of Alabama.
“A. Yes, sir.
[[Image here]]
“Q. Mr. Mixon, I’ll show you what has been marked State’s Exhibit 13 and ask if you can identify it, please, sir?
“A. Yes, sir.
“Q. What is it?
“A. It is a motion to allow a plea of guilty.
“Q. All right. And I believe in return for your agreement to enter a plea of guilty and to testify truthfully in the cause of the State of Alabama versus Otis Chapman the State has agreed to request that you be sentenced to ten years and one day?
“A. Yes, sir.”
Phillip Mixon proceeded to testify in detail that on the “evening hours of February 18, 1983,” Otis Chapman called him on the phone and picked him and his brother Sylvester up at Calera and headed toward Columbiana, that he and Otis Chapman left the vehicle in front of Mrs. Holcombe’s house, and Sylvester proceeded on to Co-lumbiana, that Otis Chapman told Sylvester “to watch Mrs. Holcombe’s husband truck *278 and when it leaves to follow him back.” His testimony continued as follows:
“A. We went on toward Mrs. Holcomb’s house. Then Otis went and cut the phone lines.
“Q. Did you see him do that?
“A. Yes sir.
“Q. All right. What, if anything, happened after that?
“A. We went back to the door. He busted the door open and we went into the house.
“Q. How were you dressed at this time?
“A. We had pillow cases over our heads.
“Q. All right. Both of you had pillow cases over your heads?
“A. Yes, sir.
“Q. I’ll show you what has been marked State’s Exhibit No. 8 and ask if you can identify that, please, sir?
“A. Yes, sir.
“Q. What is that?
“A. It is a pillow case, a white pillow case.
“Q. Can you recognize it any other way?
“A. Yes, sir. It belongs to my mother.
[[Image here]]
“Q. What, if anything, did you do after you broke in the door?
“A. Well, Otis grabbed Mrs. Holcombe and we began to start taping her wrists, her ankles and her mouth.
[[Image here]]
“Q. At anytime was anybody armed during this?
“A. Yes, sir.
“Q. And who was that, please, sir?
“A. Otis Chapman.
“Q. Did he ever present that pistol to Mrs. Holcombe?
“A. Yes, sir.
“Q. Could you tell us about that, please, sir?
“A. Put it in her face.
“Q. And what did he say?
“A. He just asked her did she have a gun or where was a gun at.
[[Image here]]
“Q. All right. What exactly did you take with you as you left the house?
“A. I’m not exactly sure. At that time I thought it was four or five hundred dollars but I wasn’t sure.
“Q. Did you receive any of the proceeds?
“A. No, sir.
“Q. Who got the money?
“A. Otis had the money.
“Q. Did Sylvester get any of the money?
“A. No, sir.
“Q. What happened after you left the house?
“A. Sylvester picked us up and we headed for Clanton.
“Q. What did you do with the pillow cases?
“A. I think we threw them away as we were leaving. I’m not sure where.
“Q. Where did you go in Clanton?
“A. Down to Otis’ cousin’s house.
“Q. Do you know his name?
“A. I only know his first name is Van.
“Q. What time did you arrive down there, please, sir?
“A. I’m not sure of the time. I think it was nine or a little after nine, or something like that.
“Q. All right. What, if anything, did you do after you went to his cousin’s house?
“A. Sit down and talked to his cousin awhile, then we left and went over to one of his friend’s house and drank a few beers.
“Q. What, if anything, happened after that, if anything?
“A. We went back to Van’s house and sit there awhile and around 11:30 or something to twelve, we headed back to Calera.
“Q. All right. What, if anything, occurred in Calera?
“A. We got out of Otis’ car and got into Sylvester’s car and headed home.
“Q. All right. When was the first time that you were contacted about this case?
*279 A. Later that morning around 12:30, or something to one.
“MR HILL: All right. I think that’s all the questions we have of this witness at this time, Your Honor.
“CROSS-EXAMINATION
“BY MR. BLALOCK
“Q. Mr. Mixon, if — I want to ask you a couple of these questions here. Before that, I would like to do a side bar.
“(WHEREUPON, the following proceedings were done in a low voice at the bench:)
“MR. BLALOCK:
Another reason why we are going to object to this person’s testimony because this person is now a witness in this trial, he has heard all the testimony.
“We invoked a Rule at the beginning of this trial and he has heard everything, all the testimony of Mrs. Holcombe, and we will say it is violative of the Rule.
“THE COURT: The objection is overruled.
“MR. BLALOCK: We except.
[[Image here]]
“Q. Mr. Mixon, you were a defendant in this case up until a few minutes ago, is that correct? .
“A. That’s correct.
“Q. And up until a few minutes ago, you had heretofore said that you were innocent of this case, isn’t that correct?
“A. That’s correct.
“Q. And isn’t it a fact that up until a few minutes ago they offered you twenty years in this case?
“A. That’s correct.
“Q. And you didn’t take it.
“A. That’s right.
“Q. Because you weren’t guilty, is that correct?
“A. No, that is not correct.
“Q. You are guilty?
“A. Yes, sir.
[[Image here]]
“Q. Haven’t you on numerous occasions stated you were down at Van ‘Deese’ Williams’ house in Clanton at seven o’clock watching the TV show Dukes of Hazzard?
“A. Orally, yes.
“Q. Who all have you told that to?
“A. No one except Mr. Fox.
“Q. Mr. Fox?
“A. Yes, sir.
“Q. Is he an investigator for the Sheriff’s Department?
“A. Yes, sir.
“Q. Have you told me?
“A. I’m not sure. I don’t recall telling you that.
“Q. Didn’t you tell me outside the courtroom here on the courthouse steps?
“A. I don’t know.”
From the last quoted testimony of Phillip Mixon, his testimony continued for forty more pages of the transcript in which he was directly examined, as well as cross-examined, as to details of what occurred among the witness, his brother Sylvester, and Otis Chapman on the night of the alleged robbery, as to the motor vehicle being driven by Sylvester and the motor vehicle being driven by Otis Chapman and as to what the witness knew as to what was done by any one of the three at Colum-biana, Calera, Clanton or at any place between such municipalities.
The witness following Phillip Mixon on the stand was Officer Richard Fox, who was called by the State and testified at length as to his activity as an investigator for the Shelby County Sheriff’s Department on duty on the evening of February 18, 1983. He testified that, after going to the Holcombe residence after the robbery had been reported and obtaining all the information and data he could as to the robbery, he determined from Mrs. Hol-combe that she had recognized the voice of one of the persons that participated in the robbery at her house, that thereafter he learned that Otis Chapman had been arrested, that he interviewed Otis Chapman at Calera, talked with him extensively and explained to him that he had a right to an attorney, that Chapman said he did not ask for an attorney and that Chapman then *280 waived his rights and gave the officer a lengthy oral statement in which Chapman denied that he had participated in the robbery. However, according to the witness, Chapman at the time gave the witness “his wallet” and the witness pulled “six hundred seventy-four dollars” in currency out of Chapman’s wallet, which currency was produced at the trial and introduced in evidence. The witness further testified that he gathered latent fingerprints from some of the furniture in the residence of Mr. and Mrs. Holcombe but was unable to obtain any fingerprints of any value. He testified as to what Mrs. Holcombe told him, that she recognized the voice of defendant Chapman as he was in the process of robbing her while he had a pistol in his hand.
At the conclusion of the testimony of Officer James Jones, the State rested. Thereupon, the attorney for the only remaining defendant in the case, Otis Chapman, Jr., stated:
. We would first like to move for a mistrial, again basing the motion for a mistrial on consolidation at the beginning, consolidation of this case with Phillip Mixon. We say it was highly prejudicial to our client and we continue to assert that up until the time it was severed.
“We file also a motion — we will move for another mistrial on the severance of Phillip Mixon after the starting of the trial and in the middle of the trial and in the middle of the State’s witnesses.
“We say that here again this is highly prejudicial to our client. It puts the defense attorney or Otis Chapman’s counsel in a position of not knowing how to adequately prepare the trial, what witnesses to put on or what witnesses not to put on, and it gives us inadequate time to prepare.
“Now as far as those motions for a mistrial at this time, that is not all the motions.
“Another motion that we would like at this time is a judgment of — move for a judgment of acquittal and base that motion on and ask the Court to exclude all the State’s evidence.
“And furthermore, that they have failed throughout this trial to make any correlation between Otis Chapman and put him inside the house other than the voice identification, which we submit is inconclusive, the voice identification of Otis Chapman by Otha Nell Holcombe.
“At no other time have they been able to put him inside the house other than the testimony of the co-defendant, Phillip Mixon, which, as the Court is aware of, a person cannot be convicted solely on the testimony of a co-defendant.
“We are asserting that there is no other evidence beside that.
“That’s it.
“THE COURT: Your motions are overruled.”
Soon thereafter, the defendant Chapman presented testimony of witnesses called by him. By the first witness, Mrs. Gothard, the defendant endeavored to show some discrepancy in the testimony of witnesses for the State as to the ownership of one of the motor vehicles as to which they had testified. The next witness for the defendant was Mrs. Connie Dorough Vansant, whose husband operated “a service station, a grocery store, a combine and a logging business on that part of Highway 25 between Columbiana and Wilsonville.” She testified that she paid Chapman for his week’s work about a week before the robbery of Mrs. Holcombe. Without ascribing any fault to Mrs. Vansant, we note that there was considerable vagueness in some of her testimony, but it was to the effect that Chapman had proved to be a good worker, making good pay and that he apparently saved a considerable amount of money, which he kept in his purse, and that this situation continued on up until a few days before the robbery of Mrs. Holcombe.
The next witness for defendant was defendant's wife, who testified that in the late afternoon of February 18, 1983, defendant came home, ate supper, and asked her to go with him to Clanton, which she *281 decided not to do. A part of her testimony on cross-examination was as follows:
“Q. All right. And what time did your husband leave your house?
“A. Around six o’clock.
“Q. Around six o’clock. So you don’t know where he was at nine o’clock that night?
“A. He was supposed to have been in Clanton.
“Q. Well, he might have supposed to have been in Clanton, but you don’t know where he was at nine o’clock, do you?
“A. No, I don’t.
“Q. Do you know where he was at 9:30 that night?
“A. If I don’t know where he was at nine, I don’t know where he was at 9:30.
[[Image here]]
“Q. So, it would not be a fair statement to say that you all were in good financial situation at this particular time of your life, would it?
“A. Well, we wasn’t in no bad place, you know.
“Q. But you were behind on your financing note, you were behind, you had not paid those currently as you were supposed to?
“A. No.
“Q. You were behind on your utility bills?
“A. For the month of January, just December and January bills.
“Q. But you were two months behind on your utilities?
“A. Uh-huh.
“Q. And you were behind on your bank notes? I think that’s all.”
The next witness in the case was the defendant Otis Chapman, Jr., whose testimony is contained in approximately fifty pages of the transcript, in which he detailed his activities and whereabouts on February 18, 1983. Before doing so, he testified that he had previously pleaded guilty to and been convicted of two felonies of forgery and one felony of burglary in Shelby County. He emphatically denied that he was guilty of the crime for which he was then being tried. He said that he “got up that morning and went to work” and “worked all day” and that “a little after six” Mrs. Vansant had paid him at the store, where his “brother and son” picked him up and drove him to his home, a trailer, where he ate supper and then went to Mr. Holcombe’s store, arriving there about 7:20 or 7:25. His testimony continued as follows:
“Q. Who, if anyone, was in there besides Mr. Holcombe?
“A. Mrs. Holcombe.
“Q. She was there?
“A. Yes, she was.
“Q. Was she behind the counter or where was she?
“A. She was behind the counter with Mr. Holcombe.
“Q. So then after you left, or did you subsequently leave there?
“A. Yes, I did.
“Q. Where, if anywhere, did you go?
“A. Well, after that, like I say, I made a phone call to Phillip Mixon and asked him did he want to ride to Clanton with me. All right, then I said—
“Q. All right, that was approximately what time?
“A. Oh, about 7:30 or twenty-five to eight.
“Q. Okay. And did you set up a meeting time?
“A. Yes. I told him that I would meet him in Calera.
“Q. Approximately what time — what time were you supposed to meet him?
“A. I told him I was going to meet him about nine o’clock, 9:30, at the Magic Mart.
“Q. In Calera?
“A. Right.”
The defendant in further testimony said that between the time of his conversation with Phillip Mixon and his subsequently meeting Phillip Mixon, the defendant rode to Shelby to see a friend, “came back to Columbiana and I made a few loops through Columbiana, just circling through Columbiana,” then drove to Wilsonville, *282 “came back to Highway 25 and took the 25 to Calera to the Magic Mart and waited for Phillip.” His testimony continued as follows:
“... So when he got there, I didn’t know at that time that his brother, Sylvester, was going too.
“When he got out, I seen him. They got out and was locking the car and said you don’t mind Sylvester riding with us, and I said no, I don’t mind, you can ride.
“Q. Did Sylvester get in the car?
“A. Yes, sir, he got in the back seat.
“Q. That was about 9:15?
“A. True.
“Q. Where, if anywhere, did you go from the Magic Mart?
“A. We went down, started heading toward Clanton on Highway 31.
“Q. On Highway 31?
“A. Right.
“Q. Approximately how long did it take you to get to Clanton from there?
“A. I imagine about thirty, thirty-five minutes. We wasn’t in no hurry.
“Q. When you went to Clanton, whose house did you go to?
“A. My cousin’s Van Williams.
“Q. Was he there when you got there?
“A. Yes, he was.
[[Image here]]
“A. All four of us went to the bootlegger’s house.
[[Image here]]
“Q. After you left the bootlegger’s you went back to Van’s?
“A. Yes.
“Q. Approximately what time was that?
“A. I would say we got back there about five to ten or ten, between there.
[[Image here]]
“Q. Approximately what time did you leave Van’s?
“A. We left his house approximately around twenty minutes to twelve, twenty-five til twelve.
“Q. Where, if anywhere, did you go then?
“A. We came back to Calera.
“Q. Who all came back?
“A. Sylvester and Phillip and myself.
“Q. Did you have any money on you?
“A. Yes, I did.
“Q. Approximately how much money did you have on you?
“A. At the time, I really didn’t know until Mr. Fox counted it.
“Q. Had you gotten paid earlier that day, afternoon. Late?
“A. Yes, I had.
“Q. Did you have the money you were paid?
“A. Yes, I did.
“Q. Did you have any hundred dollar bills?
“A. Yes, I did.
“Q. Approximately how much money did you have?
“A. I know how many hundred dollar bills I had.
“Q. How many?
“A. I had four.
“Q. How did you receive the hundred dollar bills?
“A. I received one from Vansant’s the week they paid cash money. I received one from there and I received two from Mr. Holcombe.
[[Image here]]
“Q. Well, let’s see. You stated you got one of them from Mrs. Vansant and two of them from Mr. Holcombe. How about the other one? Where did you get the other one?
“A. I really couldn’t say. I’m not sure.
“Q. Did you have other money besides the four one-hundred-dollar bills?
“A. Yes, I did.
“Q. How had you gotten paid the balance?
“A. In tens and twenties.
“Q. Tens and twenties. After you got back to the Quik Mart [sic] what, if anything, happened then?
“A. Well, when we got back, Phillip and Sylvester got out and Sylvester went down to his car. Him and Phillip got in their car. I intended to pull off, came to the 31 highway and stopped. There *283 wasn’t no car coming. I came out. After I passed the traffic light coming on down, a blue car came after me with its light on.
“Q. Did he pull you over?
“A. Yes, it did.
“Q. Do you know who pulled you over?
“A. I don’t even know the policeman.
[[Image here]]
“Q. Where, if anywhere, did he carry you to?
“A. Carried me to the Calera Jail.
[[Image here]]
“A. I left the Calera Jail with Mr. Fox and Chief Jones.
[[Image here]]
“Q. How did you find out who was robbed?
“A. Mr. Fox said it, said Ms. Holcombe had been robbed after I got to the Shelby County Jail.”
The next and last witness on the trial of the case was Ms. Nell Simon Dennis, who testified that on the night of February 18, 1983, she was at Benny Barber’s in Clan-ton, that at about “9:30 or quarter of ten” Van Williams and two other persons came there who stayed there until the witness left, which was at “ten to ten.”
The writer has deemed it appropriate to narrate, all from direct quotations, extraordinarily pertinent portions of the testimony in order to make it clear that there was strong testimony on behalf of the State that defendant was guilty, and strong testimony on behalf of defendant that he was not guilty of the robbery of Mrs. Hol-combe. Otherwise, the action of the trial court in granting State’s motion to consolidate for trial the case against Otis Chapman with the case against Phillip Mixon and in thereafter severing over the objection of defendant Otis Chapman the case against Phillip Mixon would, if erroneous, have probably been without prejudice to this appellant.
Our consideration of the entire evidence presented by the prosecution and by the defense on the trial of the cases or case, from which the instant appeal was taken, convinces us that the strongest evidence against Otis Chapman, Jr., was the testimony of Phillip Mixon, which, as stated above, was given after he had pleaded guilty himself and had received favorable treatment by the State as a consideration for his willingness to plead guilty and testify for the State in the case against this appellant. An outstanding weakness of the State’s case was another failure on its part to show by scientific testimony, including fingerprints and toxilogical evidence, any connection between this appellant and the robbery. Illustrative of this weakness was a large part of the testimony of Toxicologist Wayne Burrow, of the Alabama Department of Forensic Sciences, Birmingham Division, who testified at length as to his examination of some of the items of evidence that had been submitted to him. We quote from his testimony as follows:
“Q. Did these — the pillow cases [that were worn by the two robbers], you stated there were two hairs found' in both pillow cases, is that correct?
“A. That’s correct.
“Q. And in the white pillow case there were two hairs — one of them was consistent with Phillip Mixon’s?
“A. In the white pillow case there were two hairs that were consistent with Phillip Mixon.
“Q. And another hair was found there also, is that correct?
“A. No, the other pillow case. The print pillow case, there were two hairs present there also.
“A. Okay. What I’m asking, in the white — all right.
“In the white, there was two hairs which were consistent — were found inside that were consistent with Phillip Mixon’s hair, is that correct?
“A. That’s correct.
“Q. These hairs were sent down by the State?
“A. That’s correct.
“Q. In vials which were identified as Phillip Mixon’s?
“A. That’s correct.
*284 “Q. And then this colored pillow case where there was two hairs found also inside that pillow case?
“A. That’s correct.
“Q. Were they found inside, or where?
“A. Inside, yes.
“Q. Inside. By inside, do you mean inside the open end?
“A. Yes, sir, I opened or took the pillow cases and opened them up and pulled the inside out and examined the inside of the pillow cases.
“Q. Okay. And two hairs were found?
“A. Yes, sir.
“Q. Did you have an opinion as to whether or not the two hairs — I know one hair was consistent with Phillip Mix-on’s hair, is that correct?
“A. That’s correct.
“Q. But one hair, you stated, was inconclusive when compared with Phillip Mix-on’s hair?
“A. That’s correct.
“Q. How about Otis Chapman’s hair?
“A. No, sir, it was not similar to Otis Chapman’s hair.
“Q. In any way whatsoever?
“A. Not microscopically similar, no, sir.
“Q. Not microscopically similar, was the hair — could you tell the difference in the type — in other words, was it a Caucasian hair?
“A. No, sir, it was a Negroid hair.
“Q. Both hairs were?
“A. Yes, sir.
“Q. But the second one was inconclusive or as to Phillip Mixon but absolutely was not Otis Chapman’s?
“A. The hairs that I had for comparison, it was not microscopically similar to his head hair.
[[Image here]]
“Q. Let me ask you in finality, a final question, Wayne. In other words, from all this evidence submitted down to you there was no indication, no fingerprints, no hair similarity, nothing to indicate that Otis Chapman had ever touched any of these items, is that correct?
“A. The items that were examined, I found no fiber or hair or fingerprints that would have been related back to him, no.
“Q. Nothing to link him with this crime, is that correct?
“A. In what I examined, I did not find any personal items such as hair or fibers.
“Q. But you did as to Phillip Mixon, is that correct?
“A. That’s correct.
“Q. And some unknown person as to the other hair and the pillow case.
“A. Well, the one hair that I could not identify as to where it had originated from, yes, sir.”
What we have set forth hereinabove as to the evidence in the case enables us to proceed to a consideration of a paramount issue between the parties on appeal, i.e., whether error was committed by the' trial court to the prejudice of this appellant in its rulings pertaining to whether there should be a consolidated trial of the indictment against this defendant and the indictment against Phillip Mixon. As shown by the opinion of Presiding Judge Bowen in Holsemback v. State, supra, most of the authoritative cases on the point are cases of the appellate courts of the United States, including Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). A case relied upon in the brief of counsel for appellant in the instant case is that of United States v. Walker, 720 F.2d 1527 (11th Cir.1983), wherein the court stated at 720 F.2d 1533:
“When assessing the merits of a severance motion, the trial court must balance the possibility of prejudice to the defendant against the public interest and judicial efficiency and economy, ... and severance will be granted only if a defendant can demonstrate that a joint trial will result in specific and compelling prejudice to the conduct of his defense.”
By our consideration of a number of cases cited and relied upon in the case from which the quotation is taken, we note that the principle stated has been uniformly held in a large number of cases of the *285 appellate courts of the United States. We are prompted to follow what was held therein and in our effort to do so analyze the circumstances in the instant case to determine whether the consolidation of the two cases resulted “in specific and compelling prejudice to the conduct” of the defense of Otis Chapman, Jr. However, before commencing such analysis, we note what was said in the opinion in United States v. Swanson, 572 F.2d 523, 528 (5th Cir.1978), as follows:
“Finally, Phipps argues that the trial court erred in refusing to sever Phipps’ trial from Swanson’s under Fed.R.Cr.P. 14. Motions for severance rest in the discretion of the court and will not be overturned without an affirmative showing of an abuse of discretion. U.S. v. Perez, 489 F.2d 51 (CA 5, 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Moreover, the interest of judicial economy and the policy favoring joint trials in conspiracy cases must be weighed against the defendant’s allegations of prejudice. See id. The test in this circuit for reviewing denial of severance is that the defendant must be unable to obtain a fair trial without a severance and must demonstrate compelling prejudice against which the trial court will be unable to afford protestation. See id. U.S. v. Martinez, 466 F.2d 679 (CA 5, 1972), cert. denied, 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). Phipps did not meet this test.”
Although neither party cites any judicial authority that is directly in point on the question whether the trial court was in error in consolidating the trial of the two cases of Otis Chapman, Jr., and Phillip Mixon, we are convinced that such action constituted error prejudicial to Otis Chapman, Jr., and that such prejudice is emphasized by the subsequent proceedings in the case. It is clear that at the time of the consolidation, the trial judge, as well as Phillip Mixon and his attorney and Otis Chapman, Jr. and his attorney, knew that Phillip Mixon and his brother Sylvester had confessed to their participation in the robbery of Mrs. Holcombe. Furthermore, it is certain that law enforcement officers, as witnesses to the confession, knew that Phillip Mixon had confessed. On the other hand, this appellant never confessed to any criminal participation in the robbery, and he continued to profess his innocence by testifying as a witness for himself. Before the end of the trial of the case, Otis Chapman, Jr. and his attorney became fully aware of the fact that Phillip Mixon was guilty of participation in the robbery, notwithstanding his earlier denial of his original plea of not guilty.
We are convinced that during all of the time the trial was being conducted before the jury, the attorney handling the case for this appellant was handicapped as to his efforts to defend properly his client by reason of his client’s having been unwillingly yoked by order of the court with Phillip Mixon, whose knowingly false plea was that he was not guilty even though he had previously confessed that he was guilty. Although there was eventually a severance of each of the cases from the other, the previous consolidation of the two cases continued to hamper the defendant Chapman and his counsel and prejudiced said defendant in the minds of the members of the jury, who were not aware of the details of the proceedings as to the consolidation and doubtless were confident that the presiding judge had decided correctly that the cases should be consolidated.
We realize that the learned trial judge is not to be blamed for not foreseeing all of the injury to this appellant by the consolidation of the cases against Phillip Mixon and Otis Chapman, Jr. In this connection, we realize that it would have been difficult for the learned trial judge to have foreseen in its fullness the injury to this appellant by the consolidation of the two cases and are reminded of that fact by what is said in the opinion in United States v. Dennis, 645 F.2d 517, 523 (5th Cir.1981), as follows:
“In conclusion, we reiterate that the wide angle lens of hindsight admits a more comprehensive view than the closeup lens required at trial. Even the most experienced trial judge may be unable to *286 discern thé exact moment when a defendant is prejudiced by being tried with another. Here the record reflects that a very deliberate and conscientious effort was made to caution the jury to disregard evidence going to counts and defendants that were dismissed. With respect to Dennis, we believe the trial was fair. With respect to Terebecki, however, we are of the opinion that he did not receive a fair trial. For this reason the judgment upon jury verdict is AFFIRMED AS TO DENNIS AND REVERSED AND REMANDED AS TO TEREBECKI.”
We forgo consideration of the other two issues presented by appellant as it is hardly likely that grounds therefor will occur on another trial of this case.
For the error of the trial court in consolidating the cases of Otis Chapman, Jr., and Phillip Mixon, the judgment of the trial court should be. reversed and the cause remanded for a new trial.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
PATTERSON and TYSON, JJ., concur.
TAYLOR, J., concurs in result only.
BOWEN, P.J., and McMILLAN, J., dissent without opinion.